**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _____

DAMIAN R. JOSEFSBERG, individually and
on behalf of all
others similarly situated,                                      CLASS ACTION

     Plaintiff,

v.

UBER TECHNOLOGIES, INC.,
a Delaware corporation,

     Defendant.

_____/

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Damian R. Josefsberg, on behalf of himself and all others similarly situated,

pursuant to Federal Rule of Civil Procedure 23, and Southern District of Florida Local Rule 23.1,[1]

files this Class Action Complaint against Uber Technologies, Inc. ("UBER"). Plaintiff seeks

damages for tax fraud under of Section 7434 of the Internal Revenue Code, 26 U.S.C. § 7434

("Section 7434"). Based on personal knowledge of facts related to him and on information and

belief based on the investigation of counsel as to other matters, he alleges:

**OVERVIEW**[2]

1.     Plaintiff is a victim of UBER's widespread tax fraud and corresponding violation

of Section 7434. UBER willfully made a false and fraudulent statement to the IRS when it filed an

---

[1]All "Rule" references are to the Federal Rules of Civil Procedure Unless otherwise indicated. All
"Local Rule" references are to the Southern District of Florida Local Rules.

[2]Capitalized terms not otherwise defined in the Overview are defined below.

Information Return (1099-NEC) in 2021 with the IRS reporting that it paid $1,236.50 in nonemployee compensation to Plaintiff. That was false. Plaintiff has never driven for UBER and UBER has never paid him anything.

2.      UBER's fraudulent tax filing is the product of its corporate policy of knowingly and willfully accepting driver-applicants using the PII (including SSNs) of other people to pass UBER's driver screening to become an UBER driver ("Unscreened UBER Driver"). UBER knowingly and willfully accepts these applications to fulfill its never-ending need for more and more drivers to fuel its growth and increase its revenue. UBER knows it receives the same income from trips by Unscreened UBER Drivers as it does from trips by *screened* UBER drivers.

3.      UBER, since its inception in 2009, has consistently placed its quest for growth over compliance with the law and its own self-imposed rules to the detriment of the public with whom it interacts. This credo is woven into UBER's corporate fabric, guides its internal decision-making, and leads to unwritten internal policies that frequently conflict with the public-facing image it seeks to portray.

4.      One of the primary keys to UBER's growth, and thus increased revenue, is its ability to deliver more and more passenger trips, which requires enlisting more and more drivers to its platform to perform those passenger trips.

5.      The easier it is for prospective drivers to sign up to UBER's platform, the more drivers will, in fact, sign up. Screening barriers such as "clean" background checks, issue-free driving records, or the ability to work legally in the United States impede UBER's abilities to rapidly increase its driver pool and thus its trip deliveries.

6.      The need for UBER to rapidly enlist more and more drivers to compete in the marketplace and increase its revenue has led UBER to willfully and knowingly permit its driver-

2

applicants to use the "clean" PII of others to pass UBER's driver screening, register for UBER's platform, and drive for UBER. UBER permits this even though UBER has no idea who the Unscreened UBER driver actually is, whether that driver is permitted to legally work in the United States, and whether that driver truly has a "clean" background check or driving record—a scary thought. Plaintiff refers to UBER's corporate policy and practice of permitting driver-applicants to use the PII of others to pass UBER's driver screening and qualify to drive for UBER as UBER's "Barrier-Free Driver Screening Scheme." That Scheme directly shows the willfulness of UBER's actions for purposes of the Section 7434 claim at issue in this putative class action. UBER's Barrier-Free Driver Screening Scheme is deeply rooted in UBER's internal corporate policies, and its existence is well documented in the public domain.[3]

7.      UBER's acceptance of Unscreened UBER Drivers using other individuals' PII in the driver screening process has effectively eliminated all barriers to becoming an UBER driver. An individual with a criminal record, an unsafe driving record, and/or no authorization to work in the United States can simply use someone else's "clean" and "authorized" PII to receive access to the privileges and the status of an UBER driver, drive UBER's passengers, and receive income

---

[3]Reports of drivers using PII, including SSNs, of others to obtain employment with Uber have become commonplace, as many of these drivers would be unable to become drivers due to their prior criminal history, unsatisfactory driving record, immigration status, or lack of credit worthiness, among other things. *See* Lukas I. Alpert, *Nationwide rideshare and delivery scam put thousands of unqualified Uber and Lyft drivers onto the road with stolen identities*, Market Watch, Dec. 27, 2021, available at: https://www.marketwatch.com/story/a-nationwide-rideshare-and-delivery-scam-put-thousands-of-unqualified-drivers-onto-the-road-with-stolen-identities-11640209474 (last visited March 23, 2026); Dara Kerr, *Some Uber drivers use bogus identities and shared accounts*, CNET, Nov. 26, 2019, available at: https://www.cnet.com/tech/mobile/uber-drivers-using-fake-identities-isnt-just-a-london-problem/ (last visited March 23, 2026); Associated Press, *2 Plead Guilty in Ride-Hailing Fake Driver Account Scheme*, U.S. News, Mar. 24, 2022, available at: https://www.usnews.com/news/best-states/massachusetts/articles/2022-03-24/2-plead-guilty-in-ride-hailing-fake-driver-account-scheme(last visited March 23, 2026); available at https://www.nbcchicago.com/consumer/man-used-identity-downers-grove-man-become-rideshare-driver/3507538/ (last visited March 23, 2026).

from UBER for those passenger trips, without UBER actually knowing anything about that driver. Again, this makes no difference to UBER because it receives the same money from a *screened* UBER driver's trip as it does from an Unscreened UBER driver's trip.

8.　　　　UBER either actively created or knowingly adopted the Barrier-Free Driver Screening Scheme because UBER needs its driver-applicants to provide SSNs as part of the screening process. That includes, without limitation, to conduct background checks, to confirm authorization of the ability to legally work in the United States, and to report the income UBER pays to its drivers to the IRS through Information Returns (defined below) pursuant to the Federal Income Reporting Laws (also defined below).

9.　　　　To maintain public trust and ensure the public their ride is "safe," UBER also needs to claim it screens its drivers. The Barrier-Free Driver Screening Scheme allows UBER to tell the public that it screens its drivers, because it does actually screen someone, like Plaintiff, just not the actual Unscreened UBER Driver driving the passenger. UBER, through use of the Barrier-Free Drive Screening Scheme, has effectively found a loophole to placate the public while at the same time effectively removing all driver-screening barriers permitting virtually anyone to become an UBER driver.

10.　　　　The reality of UBER's Barrier-Free Driver Screening Scheme has come to light. Indeed, the Internal Revenue Code's, 26 U.S.C. § 1, *et seq.* ("IRC") requires that UBER file information returns ("Information Returns,"[4] such as an IRS Form 1099 ("1099")), with the IRS reporting compensation paid to contractors, here UBER's drivers. As a result of UBER's scheme, however, thousands of non-driver taxpayers have received notices that UBER has willfully and

---

[4]Section 7434 (f) incorporates 26 U.S.C. § 6724(d)(1)(A) for the definition of Information Return. *See* 28 U.S.C. § 7434 (f) (citing to 26 U.S.C. § 6724(d)(1)(A), which lists nine separate circumstances requiring the filing of an information return).

4

fraudulently filed Information Returns with the IRS falsely reporting to the IRS that UBER paid compensation to these taxpayers.

11. The non-driver taxpayer's receipt of an Information Return from UBER or notice from the IRS that UBER has filed an Information Return under his or her SSN is confirmation that UBER: (i) permitted an Unscreened UBER driver to use his or her SSN to enroll as an Unscreened UBER Driver; (ii) paid that Unscreened UBER Driver compensation without even knowing his or her true identity, whether he or she had a criminal record, an unsafe driving record, or was authorized to legally work in the United States; and (iii) willfully made a fraudulent and false statement to the IRS about the amount of payments it made to a non-driver taxpayer who received no such payments from UBER.

12. The non-driver taxpayer is not without recourse against UBER for falsely reporting to the IRS they received income or compensation from UBER. Congress, in Section 7434, created a private right of action for tax fraud under which individuals who were victimized by the willful filing of false Information Returns could sue the perpetrator for the greater of $5,000 or the actual damages incurred because of the fraudulent filing, along with the potential right to recover attorneys' fees and costs. *See* 26 U.S.C. § 7434.

13. Plaintiff, himself a victim of UBER's tax fraud and the Barrier-Free Driver Screening Scheme, brings this Class Action Complaint pursuant to Rule 23 and Local Rule 23.1 on behalf of himself and all similarly situated persons. These persons are victims of UBER's violations of Section 7434 for willful filing of fraudulent Information Returns falsely reporting to the IRS that UBER paid compensation to Plaintiff and others who received no such payments.

14. UBER violates Section 7434 by violating the IRC requirements to accurately keep records concerning payments made to employees and contractors and truthfully report payments

5

made to those employees and contractors to the IRS because UBER's Barrier-Free Driver Screening Scheme is more important to UBER's business model and bottom line.

15.     Further, UBER violates Section 7434 by violating its own self-imposed Driver Screening Policy (defined below) it claims it conducts on drivers to assure the public its services are safe.   UBER, under this self-created and imposed safety policy, is supposed to know the identity and background of its drivers. It is clear, however, that UBER did not know the true identity of the drivers that used Plaintiff's and the other Nationwide Class Members' identities when driving for UBER because unknown Unscreened UBER Drivers were really the ones driving UBER's passengers.

16.     Plaintiff and the other Nationwide Class Members meet the injury-in-fact standing requirements of Article III. They have suffered concrete injuries in the form of (i) tax liability for driver income they never received from UBER (because they never served as UBER drivers), or (ii) payments made to professionals (such as to attorneys, accountants, and/or tax preparers) required to address and correct the issues caused by UBER's filing of false Information Returns reporting phantom income to the IRS, lost income from missing work and other business endeavors, and suffered other inconveniences that monetarily impacted them. These injuries are actual and not speculative, are concrete, and were in fact suffered.

17.     Plaintiff, for example, has suffered concrete and particularized injury-in-fact by paying $560.00 to Lapekas Law and $5,945.00 to Damian & Valori, LLP to address the issues caused by UBER's willfully filing of a 1099-NEC that falsely reported UBER paid Plaintiff $1,236.50 in compensation in the calendar year 2021 ("Plaintiff 1099-NEC," a redacted copy of which is attached as **Exhibit A**).

6

18.     Plaintiff's injury described in this Complaint is directly traceable to UBER's issuance of the Plaintiff 1099-NEC to the IRS falsely reporting it paid $1,236.50 in compensation to Plaintiff in 2021, thereby violating Section 7434. This resulted directly from UBER's Barrier-Free Driver Screening Scheme pursuant to which UBER willfully and knowingly permitted an Unscreened UBER Driver to use Plaintiff's PII, including his SSN, to create an UBER account in his name, drive UBER's passengers, and receive compensation from UBER, which UBER passed off to Plaintiff in the Plaintiff 1099-NEC. UBER, itself, committed all of these acts—there is no break in this causation chain. Plaintiff's injury is directly traceable to UBER's actions or inactions.

19.     Section 7434 redresses Plaintiff's and the other Nationwide Class Members' injuries because it provides for the greater of $5,000.00 or actual damages. Injunctive relief against UBER, enjoining them from issuing 1099-NEC forms to, and filing information returns with the IRS for, any person who did not actually serve as an UBER driver, will also prevent UBER from causing further harm to Plaintiff and the other Nationwide Class Members and causing similar harm to other individuals throughout the country.

20.     Plaintiff complies with Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements for fraud claims (tax fraud here) by alleging UBER (*the who*) in or about January or February 2022 (*the when*) willfully filed the Plaintiff 1099-NEC with the IRS pertaining to Plaintiff, which fraudulently and falsely reported that UBER paid to Plaintiff $1,236.50 in compensation in the calendar year 2021 (*the what*), when UBER made no such payments to Plaintiff because he has never worked for, or received compensation from, UBER.

21.     Consistent with UBER's willingness to permit Unscreened UBER Drivers to use someone else's PII to pass driver screening to continue to rapidly increase its driver pool (*the why*), which it implements through UBER's Barrier-Free Driver Screening Scheme, UBER intentionally

7

chose not to follow the IRC Federal Income Reporting Laws and its own Driver Screening Policy it touts it performs on all of its drivers (*the how*), under both of which UBER possessed or should have possessed sufficient information to show Plaintiff never was an UBER driver and never received compensation from UBER.

22.     UBER's Barrier-Free Driver Screening Scheme is economically beneficial to UBER because it receives the same economic benefit from Unscreened UBER Drivers as it does from screened UBER drivers and it increases its driver pool by removing the barriers imposed by its Driver Screening Policy.

23.     UBER, under Section 7434, is required to pay Plaintiff and the other Class Members the greater of $5,000 in statutory damages or provable actual damages, plus attorneys' fees and costs, for willfully issuing fraudulent Information Returns with the IRS reporting payments purportedly made by UBER to Plaintiff and other Class Members when no such payments were ever made to them.

24.     Plaintiff meets all of Rule 23's requirements to certify this class action on behalf of the later-defined Nationwide Class.

### PARTIES

25.     Plaintiff, Damian R. Josefsberg, is an individual and a resident of Miami-Dade County, Florida. UBER, in 2021, issued the Plaintiff 1099-NEC to the IRS willfully and fraudulently reporting that it had paid Plaintiff $1,236.50 in compensation when UBER made no such payments to Plaintiff, and UBER's conduct caused harm to Plaintiff in the form of, among other things, payment of $560.00 to Lapekas Law and $5,945.00 to Damian & Valori, LLP.

26.     Defendant, Uber Technologies, Inc., is a Delaware corporation, headquartered at 1515 3rd Street, San Francisco, California, 94158, which: (i) is registered to conduct business in

8

Florida; (ii) maintains a registered agent in Florida; (iii) and conducts substantial business activities on a regular and continuous basis in Florida and nationwide. UBER issued the Plaintiff 1099-NEC pertaining to Plaintiff to the IRS in 2021 willfully and falsely reporting that it paid $1,236.50 when it made no such payment, and UBER's actions in this regard are part of UBER's Barrier-Free Driver Screening Scheme.

**JURISDICTION AND VENUE**

27.     This is a federal question jurisdiction-based class action in which Plaintiff asserts a single claim under Section 7434 (federal law) against UBER invoking this Court's subject matter pursuant to 28 U.S.C. §1331.

28.     This Court also has original diversity jurisdiction, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA") because Plaintiff and many members of the Nationwide Class (defined below) are citizens of states different from UBER's home state, the aggregate amount in controversy in this action exceeds $5,000,000, exclusive of interests and costs, and there are more than 1,000 members in the proposed Nationwide Class.

29.     This Court has personal jurisdiction over UBER, pursuant to Florida Statutes §§ 48.193(1)(a)(1), (2), and (6), because it conducts substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and Plaintiff's claim arises out of UBER's operating, conducting, engaging in, or carrying on a business or business venture, or having an office or agency, in the State of Florida, committing a tortious act in this state, and causing injury to Plaintiff in this state arising out of UBER's acts and omissions outside this state; and at or about the time of such injuries, UBER was engaged in solicitation or service activities within this state. This Court also has personal jurisdiction over UBER because it consented to jurisdiction by registering to do business in Florida.

30. UBER has marketed, advertised, sold, and performed its services within this District so UBER has sufficient contacts with this District to subject UBER to personal jurisdiction.

31. Venue is proper in this District, under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District, UBER has caused harm to Plaintiff and other Nationwide Class Members residing in this District, and UBER regularly conducts business in this District.

**ADMINISTRATIVE MATTERS**

32. Plaintiff, pursuant to Section 7434(d), will provide a copy of this Complaint to the IRS upon his filing of it with the Court. *See* 26 U.S.C. § 7434(d).

**FACTUAL BACKGROUND**

A. **UBER's Origin, Business Model, and Current Market Capitalization**

33. UBER is a San Francisco, California based transportation (rideshare) company that began as Ubercab in 2009, and, among other things, develops, markets, and operates a mobile-application-based ride-sharing transportation network (the "UBER App").

34. The UBER App allows users to submit a trip request on their smartphone, which is transmitted to nearby UBER drivers for acceptance and completion, providing point A to point B transportation like that provided by traditional taxi services.

35. In December 2013, *USA Today* named UBER its technology company of the year.

36. As of March 23, 2026, UBER stock is trading at approximately $75 per share and it has a market capitalization of approximately $155 Billion USD.

10

**B.**     **UBER's Business Model Requires Rapidly Adding Drivers Because the More Drivers It Has on the Road the More Revenue UBER Makes, Which Has Led to the Creation or Adoption of Unscrupulous Business Practices, including the Barrier-Free Driver Screening Scheme.**

37.     Uber, through the Uber App, connects passengers seeking transportation with available drivers based upon their location.

38.     To grow its business and generate revenue UBER requires an ever-increasing number of drivers.

39.     UBER's revenue, competitiveness, and growth depends on, among other things, having as many drivers on the road as possible.

40.     Given this reality, UBER is incentivized to facilitate frictionless driver enrollment to rapidly increase the ranks of its driver pool.

41.     Any requirements that discourage driver enrollment impair UBER's ability to increase the number of drivers and, correspondingly, its revenue.

42.     UBER, in the early years, conducted no driver screening and simply required UBER drivers to have a valid driver's license and a vehicle.

43.     UBER then began to promote to the public that it screened its drivers to build a sense of public trust and to mitigate the growing number of reports of serious safety incidents being perpetrated by UBER's drivers on UBER's passengers, especially female passengers ("Driver Screening Policy").[5]

---

[5]The evolution of UBER's driver screening policy and the safety incidents reported by UBER's passengers are chronicled in *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, 23-md-03084-CRB (N.D. Cal.).

44.     But UBER's Driver Screening Policy relies upon the information provided to it by its driver applicants and not biometric data (like fingerprints) used by the taxi industry.[6]

45.     UBER chose to use driver-applicant-supplied information rather than biometric data because of its economic incentive and motivation to reduce friction during the driver application process to facilitate rapid onboarding of new drivers to maintain its ability to meet trip demands.[7]

46.     One of the requirements to be an UBER driver is to have a SSN, which is used for, among other things, background checks, verification of the legal ability to work in the United States, and reporting income to the IRS as required by the IRC. But this information is provided by the driver applicant—an intentional design flaw in UBER's Driver Screening Policy that it knowingly and willfully refuses to correct to avoid disruption of the driver enrollment process.

47.     The requirement for UBER drivers to have a SSN and undergo a background check imposes a barrier to driver enrollment—so UBER needed a loophole to circumvent this barrier.

48.     UBER does not verify that the SSNs and other PII submitted through the Driver Screening Policy do, in fact, belong to the driver-applicants.

49.     UBER chooses not to verify this information to reduce the friction involved in the Driver Screening Policy.

---

[6]UBER settled for $10 million a class action lawsuit in California relating to its $1 safe rider brought by state prosecutors who proved UBER's driver screening tests were inferior to the background checks taxi drivers undergo. *See* https://www.forbes.com/advisor/legal/product-liability/uber-rideshare-lawsuit/ (last visited March 23, 2026).

[7]UBER is well-aware of the shortcomings of its Driver Screening Policy as evidenced by the two class action lawsuits it settled relating to false advertising concerning driver safety procedures. *See* https://www.uber.com/newsroom/class-action-settlement/ (last visited March 23, 2026).

50.     It is widely known and publicly knowable that SSNs are available for purchase for as little as $4 on the "darknet."[8]

51.     UBER's never-ending need for drivers has created a corporate culture of knowingly and intentionally removing the barriers to driver enrollment by permitting Unscreened UBER Drivers to use the PII of others to qualify to become UBER drivers.

52.     UBER is fully aware of and fosters the practice of Unscreened UBER Drivers using other individuals' "clean" PII to enroll as an UBER driver.

53.     UBER is rewarded for its complicitly with this problem by enrolling Unscreened UBER Drivers that otherwise would not qualify as an UBER driver for issues ranging from having a criminal record to lacking legal authorization to work in the United States.

54.     UBER, by permitting Unscreened UBER Drivers to work among its drivers' ranks, has expanded the potential driver pool dramatically by including within it these otherwise unqualified individuals.

55.     UBER's knowledge and allowance of Unscreened UBER Drivers' use of PII to pass the UBER's Driver Screening Policy is well-known and equally well-reported.[9]

56.     Recent news articles reveal and confirm that UBER driver profiles are available for sale or rent.[10] This publicly available information is accessible to UBER, and UBER does nothing to prevent this practice from occurring—confirming its complicity.

---

[8]*See* https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/ (last visited March 23, 2026).

[9]*See* Note 3, *supra.*

[10]https://www.cnn.com/2025/04/14/tech/facebook-groups-buy-sell-uber-doordash-deliveroo-accounts/index.html (last visited March 23, 2026).

57. Despite the well-documented problems with UBER's Driver Screening Policy, UBER chooses to adhere to the Barrier-Free Driver Screening Scheme at issue in this case, which UBER could end by simply verifying PII provided by driver-applicants was their PII, conducting in person or Zoom, Teams, Skype, or other video transmission interviews, or gathering references from prior employers—all of which are standard practice for almost any other employer in the United States (whether employing w-2s or independent contractors).

58. UBER openly and publicly admits that it chooses business profitability over effective driver qualification and background checks. For example, UBER, in its 2022 Annual Report, Form 10-K, stated, "[C]hanges in Driver qualifications and back-ground check requirements may increase our costs and reduce our ability to onboard additional Drivers to our platform."[11] Buried deep in a federal securities filing UBER admits it has no intention to dismantle the Barrier-Free Driver Screening Scheme.

59. Seemingly, the only downside risk for UBER stemming from its implementation and/or adoption of the Barrier-Free Driver Screening Scheme comes in the form of lawsuits from victims of the practice like Plaintiff and the other Nationwide Class Members.

60. In the past, UBER's response to such lawsuits was to point the finger at someone else. But UBER cannot shift the blame for its Section 7434 violations to the Unscreened UBER Driver because the Unscreened UBER Driver did not willfully issue the false and fraudulent Information Returns to the IRS pertaining to Plaintiff and the other Class Members—UBER did.

61. UBER's affirmative action of willfully filing the fraudulent Information Returns is the conduct that caused Plaintiff's and the other Nationwide Class Members' damages.

---

[11] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001543151/000154315122000008/uber-20211231.htm (last visited March 23, 2026).

**C.** **Federal Income Reporting Laws Require UBER to Truthfully and Accurately Report the Income or Compensation It Pays to Its Drivers to the IRS.**

62. The federal income tax laws under the IRC are dependent on truthful and accurate reporting to the IRS of income and compensation paid to and received by taxpayers.

63. UBER is obligated to obtain true and accurate information from its employees and contractors for compliance with the information reporting requirements of the IRC, including but not limited to, IRC §§ 6041, 6041A, 6051 ("Federal Income Reporting Laws"). *See* 26 U.S.C. §§ 6041, 6041A, 6051.

64. UBER is aware of but fails to comply with the Federal Income Reporting Laws.

65. UBER drivers are contractors of UBER who receive income or compensation from UBER for performing services for UBER.

66. The Federal Income Reporting Laws require UBER to file truthful and accurate Information Returns, such as 1099s, with the IRS pertaining to the amount of payments UBER made to its drivers during a calendar year that exceed $600 for federal income tax purposes. *See* 26 U.S.C. §§ 6041, 6041A, 6051.

67. The IRC specifically addresses the failure to comply with certain information requirements. *See* 26 U.S.C. §§ 6721-6725.

68. UBER, under the Federal Income Reporting Laws, prior to making payment to an UBER driver, is required to obtain from the driver, among other things, his or her name, address, and identification number, such as a social security number.

69. UBER, because of the forgoing federal income tax laws, is required to know the PII, including the SSN, of each of its drivers to whom UBER pays income or compensation.

70.     Compliance with the foregoing requirements is simple for drivers who are actually screened because they provide UBER with that information during UBER's Driver Screening Process.

71.     The allegations in this Class Action Complaint, various news articles, and UBER's own website, reveal that UBER has committed serial violations of the Federal Income Reporting Laws by willfully filing false and fraudulent Information Returns with the IRS that wrongly report, among other things, amounts of income or compensation paid to taxpayers that were neither remitted by UBER to the taxpayer or received by the taxpayer.

72.     UBER, at all times material to the allegations in this Class Action Complaint, under the Federal Income Reporting Laws, was required to possess the information that shows the Information Return that UBER filed with the IRS for the calendar year 2021 reporting payment to Plaintiff in the amount of $1,236.00 was false.

73.     UBER, under the obligations imposed by the Federal Income Reporting Laws, was required to possess accurate information about the individual who actually received the $1,236.00 UBER falsely reported to the IRS was paid to Plaintiff.

74.     UBER's awareness of, and need to comply with, the obligations imposed by the Federal Income Reporting Laws to possess accurate information about the receipt of the $1,236.00 that was reported as being paid to Plaintiff and its clear violations of those laws shows the willfulness of its filing of the false 1099-NEC pertaining to Plaintiff.

75.     Had UBER complied with the Federal Income Reporting Laws it would not have filed the false 1099-NEC pertaining to Plaintiff or the other false Information Returns filed pertaining to the other Nationwide Class Members.

16

**D.**     **UBER's Passenger Safety Crisis and Its Efforts to Convince the Public Its Services Are Safe to Maximize Market Share and Profits.**

76.     In its early stages, passenger safety and UBER's ability to provide it was one of the, if not the most, significant challenges UBER needed to overcome to convince the public that its model was a safe and reasonable means of transportation.

77.     The reality about the history of the safety problems inherent in UBER's business and the actions UBER claims it takes to address those safety issues are at the heart of the pending Mult-District Litigation pending in the United States District Court in the Northern District of California captioned *In re UBER Technologies, Inc. Passenger Sexual Assault Litigation*, No. 3:23-md-03084-CRB ("UBER Passenger Sexual Assault MDL").[12]

78.     UBER, to ever have a chance at success, had to convince the public it was a safe and reasonable alternative to heavily regulated taxis services—enter its proclaimed Driver Screen Policy.

79.     UBER drivers, according to UBER, are now required to undergo initial and routine follow-up background checks and identity verifications for the safety of its customers.

80.     UBER's website contains an extensive page dedicated to "UBER's Driver Screening Policy, " under which UBER describes its "Driver Screening Procedures."[13] *See* https://www.UBER.com/us/en/ride/safety/driver-screening/ (last visited March 23, 2026).

---

[12] *See* Master Long Form Complaint in Uber Passenger Sexual Assault MDL.

[13]Several states have mandated controls for ride-sharing drivers. *See, e.g.,* https://help.uber.com/driving-and-delivering/article/fingerprinting-requirements?nodeId=4693107e-e628-4b55-8c66-064481bd1c97 (last visited March 23, 2026) (New York ride-sharing drivers are required to undergo fingerprinting and photographing); Fla. Stat. § 627.748(12) (Florida ride-sharing drivers are required to undergo background checks every three years). Further, ride-sharing industry participants, even those in direct competition, share information about disciplined drivers with other platforms to protect the public from unsafe drivers. *See* https://www.lyft.com/blog/posts/lyft-and-uber-launch-industry-sharing-safety-program-in-the-us (last visited March 23, 2026).

81.     Among the policies provided on UBER's Driver Screening Policy webpage, UBER warrants[14] the following:

a.  **Driver screening**. Everyone who drives with UBER is screened before their first trip. In addition, UBER reruns these driver screenings[] every year and uses technology to look for issues in between. It's part of our commitment to help keep you safe when you request a ride with UBER.

b.  **Drivers are background checked before their first trip**. Prospective drivers must undergo a multi-step safety screen that checks for issues including, but not limited to, driving violations, impaired driving, and violent crime.

c.  **Drivers must pass an annual check to continue accessing the app**. UBER proactively reruns driving[] and criminal history checks every year to ensure that drivers continue to meet our standards.

d.  **Assuming someone else's identity is prohibited**.  Drivers are periodically asked to take a photograph of themselves, which we match against their on-file identification to help make sure the right driver is behind the wheel.

82.     UBER advertises the thoroughness of the UBER Driver Screening Policy and attendant procedures to attract customers by proclaiming its safety measures.

83.     UBER's marketing efforts directed toward convincing passengers its services are safe are addressed in extensive detail in the Master Long-Form Complaint in the UBER Passenger Sexual Assault MDL.

84.      UBER, because of the UBER Driver Screening Policy, undertakes a duty to become aware of the identity of each of its drivers to whom UBER pays income.

85.     UBER's Driver Screening Policy created a duty for UBER to know the true identity of the individual to whom it paid the $1,236.50 that it reported to the IRS that it paid to Plaintiff,

---

[14]The *Driver Screening* page states that the information contained therein applies to all drivers using UBER in the 50 U.S. states and Washington, DC.

and its violations of its own Driver Screening Policy show that its filing of the Plaintiff 1099-NEC was willful.

86.     Had UBER complied with its Driver Screening Policy it would not have filed the false Plaintiff 1099-NEC as to Plaintiff and the false Information Returns as to the other Nationwide Class Members.

87.     UBER's implementation and/or adoption of its Barrier-Free Driver Screening Scheme runs counter to the Driver Screening Policy it touts to the public and permits UBER to portray in the public's eye that it cares about and takes steps to address public safety concerns when in reality UBER knowingly and willfully accepts Unscreened UBER Drivers using other people's PII to pass the advertised Driver Screening Policy and pays those Unscreened UBER Drivers while pushing the federal income tax liability upon the individual whose PII was used to qualify the Unscreened UBER Driver.

88.     UBER wins public confidence by advertising it takes steps to address issues pertaining to passenger safety through its public facing Driver Screening Policy while in reality its clandestine Barrier-Free Driver Screening Scheme, which knowingly permits Unscreened UBER Drivers to use the PII of those like Plaintiff and the members of the Nationwide Class, prevails in practice.

**E.     UBER's Desire for Profits Leads to Its Expedient Driver Intake Practices That Trump Compliance with Federal Income Reporting Laws and the Accuracy of Information Returns.**

89.     Since its inception, UBER has put profits before all else. That is at the heart of many lawsuits and settlements, including the UBER Passenger Sexual Assault MDL because UBER rushes to enlist drivers without regard to whether those drivers presented a threat to UBER's passengers.

19

90.     That same drive for profits has led UBER to disregard the veracity of the information drivers submit to sign up to work for UBER, which has led to rampant enrollment of Unscreened UBER Drivers among the ranks of its drivers. That is exemplified by the thousands of false Information Returns UBER has knowingly filed leading it to create dedicated pages of its website to address tax fraud victims like Plaintiff and the other Nationwide Class Members.

91.     Based upon the Federal Income Reporting Laws and the Driver Screening Policy, UBER knew or should have known the identity of the drivers to whom it pays income or compensation each calendar year to properly complete and submit truthful Information Returns to the IRS.  Indeed, UBER knew the names on the bank or other accounts to which it sent these payments and, in many if not most cases, those accounts were not in the names of, or owned by, the Nationwide Class Members.  Upon information and belief, in most if not all cases, the UBER drivers who had stolen the PII of Plaintiff and the Nationwide Class Members and received income or compensation from UBER did not receive it in accounts that the UBER drivers had opened using the PII of Plaintiff or the Nationwide Class Members.  Rather, those UBER drivers received the payments from UBER in accounts titled in other names using other PII.  As such, UBER knew or should have known that Plaintiff and the Nationwide Class Members had not actually served as the UBER drivers for the rides for which UBER was paying the compensation, and that their PII had been used by the UBER drivers to open their UBER driver accounts.  Therefore, the information in the 1099s that UBER had issued to Plaintiff and the Nationwide Class Members and in the Information Returns that UBER had filed with the IRS was false.  Plaintiff is unaware of any bank or other account being opened with his PII by any UBER driver, and, upon information and belief, the same is true for many if not most of the Nationwide Class Members.

20

92.     The 1099-NEC UBER summited to the IRS for Plaintiff is particularly egregious and demonstrative of UBER's willful filing of a fraudulent Information Return with the IRS.

93.     For example, the Information Return that UBER submitted to the IRS pertaining to Plaintiff is facially deficient because it fails to include Plaintiff's street address, which is a required field on Form 1099-NEC.  Instead, it states "UNKNOWN" as the street address, and only includes "Weston, FL 33327" as the city, state, and zip code for Plaintiff.

94.     Concerning the Plaintiff 1099-NEC, UBER also failed to accurately report to the IRS that the Unscreened UBER Driver received $1,236.50 from UBER in 2021, thereby also violating the Federal Income Reporting Laws and potentially depriving the United States of the income tax revenue from the Unscreened UBER Driver, assuming that Unscreened UBER Driver even had a social security number and authorization to work in the United States.

95.     UBER's Barrier-Free Driver Screening Scheme has far reaching consequences and potentially deprives the United States of unknown amounts of income tax each year by willfully and fraudulent issuing Information Returns to the wrong individuals, whom will not be required to pay tax on income they did not receive, and fails to impose that income tax on the drivers who enrolled as Unscreened UBER drivers through UBER's Barrier-Free Driver Screening Scheme.

96.     UBER filed Information Returns that falsely reported to the IRS that Plaintiff and the other Nationwide Class Members were UBER drivers and received income or compensation from UBER when Plaintiff and the other Nationwide Class Members were not UBER drivers and received no income or compensation from UBER.

97.     On or about June 19, 2022, Plaintiff learned that UBER had filed the plaintiff 1099-NEC in his name and under his social security number reporting to the IRS that he had received income or compensation from UBER in the calendar year 2021.

21

98.     Plaintiff did not receive a copy of the Plaintiff 1099-NEC from UBER.

99.     Rather, Plaintiff learned of the Plaintiff 1099-NEC through an IRS transcript for the year 2021 reflecting that UBER had issued the Plaintiff 1099-NEC under Plaintiff's social security number for compensation from UBER in the amount of $1,236.50.

100.    Plaintiff has never applied to be, or been, a driver for UBER, nor has he ever been an employee or independent contractor for UBER.

101.    Plaintiff never received $1,236.50, or any amount, from UBER in 2021 or any other year.

**F.      UBER Located, within 24 Days, the UBER Driver Account Opened by the Unscreened UBER Driver Using Plaintiff's PII, Showing It Could Have Prevented Its Filing of the Willful and Fraudulent Plaintiff 1099-NEC.**

102.    Suspecting that UBER had opened a driver account under his name, Plaintiff, through undersigned counsel, sent a letter to UBER on August 15, 2022, demanding that it deactivate and cease operation of all UBER driver accounts using Plaintiff's PII.

103.    In the same correspondence, Plaintiff requested that UBER provide all documents related to any background checks and identification verification in connection with any UBER driver accounts using Plaintiff's name, social security number, or other PII.

104.    Plaintiff also requested that UBER provide all 1099 forms or W-2 forms issued in Plaintiff's name, along with any supporting or related documents.

105.    On September 8, 2022, UBER responded to Plaintiff's August 15, 2022 correspondence, stating that it identified an account using Plaintiff's PII.

106.    Based upon information and belief, UBER also had bank account or other electronic payment method information for the Unscreened UBER Driver using Plaintiff's PII because UBER reported to the IRS on the Plaintiff 1099-NEC that UBER paid "someone" $1,236.50 in

2021 and that "someone" was not Plaintiff but was the Unscreened UBER Driver using Plaintiff's PII.

107. UBER could have cross-referenced (or should have been able to cross-reference) the bank account or other electronic payment method information provided by the Unscreened UBER Driver using Plaintiff's PII and discovered that the payment information did not match. It could have then prevented the Unscreened UBER Driver from using the UBER driver account opened in Plaintiff's name to avoid making payments to "someone" under Plaintiff's PII, which then led to the filing of the false Information Return in Plaintiffs' name and also exposed UBER passengers to the risk of an Unscreened UBER Driver.

108. Also, UBER could have conducted basic due diligence to confirm that the Unscreened UBER Driver and the Plaintiff was the same person, including by performing a Google search of the Plaintiff or running a simple Accurint search or skip trace to determine Plaintiff's actual phone number and/or email address and contacting him to confirm that he was in fact applying to become an UBER driver.  But, UBER failed to take these simple, logical steps.

109. Had UBER performed the foregoing cross-referencing or basic due diligence, UBER could have avoided filing the false Plaintiff 1099-NEC with the IRS and instead filed an accurate 1099-NEC pertaining to the Unscreened UBER Driver if the individual had a SSN.

110. UBER instead willfully violated the Federal Income Reporting Laws by filing the false Plaintiff 1099-NEC because it chooses to follow its Barrier-Free Driver Screening Scheme and permit Unscreened UBER Drivers to populate its driver pool, get paid income or compensation, and not pay federal income taxes on that income or compensation because UBER does not issue Information Returns pertaining to them to the IRS.

**G.     UBER Conducts its Barrier-Free Driver Screening Scheme Openly and Notoriously, Leading to Its Willful Filing of Thousands of Fraudulent Information Returns, With Each One Constituting a Separate Section 7434 Violation.**

111.    UBER knows that it has willfully filed thousands if not tens of thousands of fraudulent Information Returns falsely reporting to the IRS that individuals had driven for and received income or compensation from UBER when in fact those representations to the IRS were false.

112.    Thousands if not tens of thousands of individuals have complained to UBER that they received notice that UBER has filed with the IRS false Information Returns using their PII.

113.    Such complaints are so common that UBER set up pages on its website to investigate these complaints and request documents from the individuals who received notice of UBER's filing of the fraudulent Information Returns pertaining to them.

114.    UBER's own website included a page titled "I do not drive with UBER, but I received a 1099 tax document from UBER" and stating that "If you believe you incorrectly received 1099 tax document(s) from UBER, please complete the information fields below. Our team will review and follow up with you."  *See* **Exhibit B.**[15]

115.    UBER's website included a page titled "UBER 1099 Investigation Document Upload" stating, "To help expedite our investigation, please upload photos of the following: The 1099 document you received; Your valid photo ID (Driver's License, valid Passport, State ID or Permanent Resident Card / Green Card); Yourself (selfie) holding your provided valid photo ID;

---

[15] The URL for this page was https://help.uber.com/driving-and-delivering/article/i-do-not-drive-with-uber-but-i-received-a-1099-tax-document-from-uber?nodeId=edd5d179-cbd5-49b7-ae55-19d865cd9efa, but it is no longer active.  A similar page is now on Uber's website with the title "1099 delivery error" and similar content. *See* https://help.uber.com/en/driving-and-delivering/article/1099-delivery-error?nodeId=fb42affe-950d-4b38-b39a-281a308c10c9    (last visited March 23, 2026).

A police report filed at your local police station or an FTC Identity Theft Report, which you can fill out at the link below[.]"

116. The irony of the foregoing procedures is that UBER does not require that level of verification for its driver applicants. And if it did, the Barrier-Free Driver Screening Scheme would unravel because UBER could no longer enroll Unscreened UBER Driver's using other people's PII.

117. The wide-spread nature of UBER's willful and fraudulent filing of false Information Returns makes class action treatment particularly proper.

**H.  Plaintiff and Other Nationwide Class Members Have Suffered Concrete Harm and Particularized Actual Injuries.**

118. Plaintiff has expended significant time and resources seeking to mitigate the damages caused by UBER's willful filing of the fraudulent Plaintiff 1099-NEC, including: (i) hiring and paying tax professionals to submit corrected filings and remediate adverse effects on his tax filing status, thereby incurring $560.00 in expenses; (ii) submitting required reports with the FTC; (iii) submitting that report and various personal records to UBER; and (iv) hiring legal counsel to send correspondence to UBER demanding the correction of the fraudulent Plaintiff 1099-NEC, the cancellation of the fraudulent UBER driver account, the production of records regarding the identify verification and background investigation associated with that driver account, incurring $5,945.00 in legal fees, and to prepare and file this Complaint and prosecute this action.

119. To date, Plaintiff's out of pocket expenses resulting from UBER's willful filing of the fraudulent Plaintiff 1099-NEC total $6,505.00.

120. Based upon information and belief, the other Nationwide Class Members have incurred similar and readily identifiable and measurable damages.

Section 7434 provides for the greater of $5,000 for each false Information Return or actual damages.

## CLASS ACTION ALLEGATIONS

### A. Class Definition and Class Size

121. Plaintiff brings this putative Class Action against UBER, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and Local Rule 23.1, on behalf of himself and all others similarly situated.

122. Plaintiff seeks certification of the following "Nationwide Class":
All individuals in the United States for whom UBER reported to the IRS on an Information Return that UBER paid money or other compensation to those individuals when those individuals did not receive any money from UBER for the tax year in which UBER reported to the IRS that it paid such compensation on an Information Return, during the applicable limitations period.

123. Plaintiff refers to the members of the Nationwide Class as "Nationwide Class Members."

124. Plaintiff also seeks certification of the following "Nationwide Sub-Class", within the Nationwide Class:

All persons in the United States for whom UBER reported income on an Information Return where the identity given to UBER did not match the identity associated with the bank or other account to which UBER sent payment for income or compensation for conducting UBER rides.

125. Plaintiff refers to the members of the foregoing Nationwide Sub-Class as "Nationwide Sub-Class Members".

126. References herein to the Nationwide Class include the Nationwide Sub-Class unless otherwise specified. References to the Nationwide Class Members include the Nationwide Sub-Class Members unless otherwise specified.

26

127.    Excluded from the Nationwide Class are UBER, its affiliates, employes, agents, and attorneys, and the Court.

128.    Plaintiff reserves the right to amend the Nationwide Class and Nationwide Sub-Class, and to add further subclasses, if discovery and further investigation reveal such action is warranted.

129.    Plaintiff estimates the approximate size of the Nationwide Class is more than one thousand members.

**B.  Rule 23(a)--Prerequisites.**

130.    The court should certify this action as a class action under Rule 23(a) and Local Rule 23.1 because it satisfies the requirements of: (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy.

*1.  Numerosity.*

131.    The Nationwide Class meets the Rule 23(a)(1) numerosity requirement, which courts have found, as a general matter, is satisfied when the class size exceeds 40 members.

132.    The number of people comprising the Nationwide Class is so numerous that joinder of all members is impracticable.

133.    While the exact number of members of the Nationwide Class is unknown to Plaintiff at this time, Plaintiff believes in good faith that the Nationwide Class includes over one thousand members who will be identifiable from records maintained by UBER.

134.    Plaintiff believes that the Nationwide Class contains at least 1,000 members based upon the number of complaints that individuals have made to the FTC based on their receipt of

fraudulent Information Returns from UBER,[16] UBER's website pages dedicated to investigating fraudulent Information Returns filed by UBER and collecting records and police reports or FTC Reports from individuals who received the fraudulent Information Returns from UBER,[17] and the number of individuals who contacted undersigned counsel and explained that they had received fraudulent Information Returns from UBER but had never worked as drivers for or received income from UBER and suffered damages as a result.[18]

### 2. *Commonality.*

135. Proof of a common or single set of facts will establish UBER's liability under Section 7434 and the right of each Plaintiff and the absent Nationwide Class Members to recover damages from UBER.

136. The Nationwide Class meets the Rule 23(a)(2) commonality requirement because there is at a minimum a single significant question of law or fact pertaining to UBER's violations of Section 7434 by willfully filing false and fraudulent Information Returns reporting to the IRS that it paid income or compensation to Plaintiff and the Nationwide Class Members when it paid no such compensation to them.

---

[16]In response to a Freedom of Information Act ("FOIA") request, the FTC provided to Plaintiff a spreadsheet listing hundreds of complaints that the FTC had received from individuals who received fraudulent 1099s from Uber yet did not serve as drivers for or receive income from UBER.

[17]*See* Note 4, *supra*.

[18]Several individuals reported that they had received Information Returns from UBER falsely indicating income earned from driving for UBER, despite never having worked for UBER or even registered as drivers. These false Information Returns from UBER resulted in the individuals experiencing tax filing discrepancies, receiving IRS notices, incurring tax liabilities, and expending time and resources (including out-of-pocket expenses) to rectify the situation and mitigate the damages they suffered or continue to suffer, including contacting UBER, reporting the issue to UBER and the FTC, and having the false Information Returns corrected or retracted.

28

137.    Questions of fact and law common among Plaintiff and the members of the Nationwide Class include, but are not necessarily limited to, the following:

a.    Whether UBER willfully issued the Information Returns in the names of Plaintiff and the other members of the Nationwide Class to the IRS reporting compensation paid to them when no such payments were made.

b.    Whether the Information Returns UBER filed with the IRS pertaining to Plaintiff and the other Nationwide Class Members were false.

c.    Whether Plaintiff and the other Class Members suffered damages as a result of UBER's having filed fraudulent Information Returns in their names and the amount of such damages to the extent they exceed $5,000.[19]

138.    The Court can resolve Plaintiff's and the other Nationwide Class Members' Section 7434 claims in one stroke by determining that UBER willfully and fraudulently filed false Information Returns reporting that it paid compensation to Plaintiff and the other Nationwide Class Members when it paid no compensation to them in violation of Section 7434.

### 3. *Typicality*.

139.    Plaintiff's interests align and are reasonably coextensive with the interests of the absent Nationwide Class Members' interests.

140.    Plaintiff's Section 7434 claim is typical and representative of the other Nationwide Class Members' Section 7434 claims in that UBER willfully filed a fraudulent Information Return with the IRS pertaining to Plaintiff (the Plaintiff 1099-NEC) and each Nationwide Class Member that contained false information regarding the amounts that UBER claims to have paid to Plaintiff

---

[19] Given that Section 7434(b) provides for damages of the greater of $5,000 for each fraudulent Information Return filed or the amount of actual damages sustained by each Class Member, it is not necessary for each member of the Nationwide Class to provide the amount of his or her actual damages. But, because Class Members did suffer actual damages because of UBER's violation of the statute, they will establish and seek recovery of those damages if they are greater than $5,000.

29

and the Nationwide Class Members, when UBER made no such payments to them in violation of Section 7434.

141.    Plaintiff's claims and the Nationwide Class Members' claims arise from the same course of conduct by UBER and those claims are based upon the same legal theory—Section 7434.

142.    Plaintiff and each other Nationwide Class Member suffered the same or similar damages as a result of such violation and, pursuant to Section 7434(b), are entitled to recover the greater of $5,000 for each false Information Return filed or the amount of actual damages sustained by Plaintiff and each other Nationwide Class Member, plus the costs of this action and reasonable attorneys' fees.

143.    UBER's conduct in willfully filing with the IRS the false and fraudulent Plaintiff 1099-NEC is identical to UBER's conduct concerning the other Nationwide Class Members in willfully filing with the IRS the false and fraudulent Information Returns as to them.

144.    Plaintiff, on behalf of himself and each other Nationwide Class Member, will establish liability against UBER by proving that UBER willfully and fraudulently filed false Information Returns with the IRS that falsely reported that it had paid income to Plaintiff and the other Nationwide Class Members when it did not.

145.    Plaintiff has the incentive to and will vigorously litigate the claims of all the Nationwide Class Members.

### 4. Adequacy.

146.    Plaintiff and his counsel do not have any conflicts of interest with other members of the Nationwide Class.

30

147.     Plaintiff will fairly and adequately represent and protect the interests of the entire Nationwide Class because Plaintiff has suffered a loss like the losses suffered by the other Nationwide Class Members because of UBER's fraudulent tax filings.

148.     Plaintiff is directly interested in the outcome of, and will vigorously prosecute, this action.

149.     Plaintiff is willing and prepared to serve the Nationwide Class in a representative capacity with all the obligations and material duties necessary. Plaintiff is cognizant of, and determined to faithfully discharge, his duties to the absent Nationwide Class Members.

150.     Plaintiff has engaged the services of the undersigned counsel. Counsel is competent and experienced in complex civil litigation and class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and all absent members of the Nationwide Class. Collectively, Plaintiff's counsel has served as lead counsel in over 500 class actions across the country.

151.     Plaintiff's counsel also are experienced in commercial litigation, receivership law, and bankruptcy law, and have litigated cases through trial and appeal throughout state and federal courts in Florida and the United States.

### C.  Rule 23(b)—Type of Class Action.

152.     The court should certify this action as a class action under Federal Rule of Civil Procedure 23(b)(3) because it satisfies the requirements of Rule 23(a)(1-4) and the Requirements of Rule 23(b)(3): (i) predominance; and (ii) superiority.

153.     Class-action status is warranted under Rule 23(b)(3) because questions of fact or law common to the members of the Nationwide Class predominate over any questions affecting

31

only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### 1. *Predominance*

154.    The Nationwide Class has a high degree of similarity and is cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a damages class action.

155.    The common issue of whether UBER willfully filed fraudulent Information Returns with the IRS falsely reporting that it had paid compensation to Plaintiff and the other Nationwide Class Members when it had paid no such compensation to them is the common, aggregation-enabling, issue in the case and it is more prevalent than any other issue.

156.    Section 7434 is a federal law-based tax fraud claim, so the claim is based upon the same federal law throughout the Nationwide Class, and the laws of different jurisdictions do not come into play.

157.    This common question concerning UBER's violation of Section 7434 is the most significant aspect of this case, and it can be resolved for all members of the Nationwide Class in a single adjudication.

158.    Section 7434 focuses on UBER's conduct, so individualized issues among members of the Nationwide Class will not swamp the factual and legal issues in this class action.

159.    UBER has acted with respect to Plaintiff and all Nationwide Class Members in a manner generally applicable to each of them. There is well-defined community of interest in the questions of law and fact affecting the Class which satisfies the requirements of Rule 23.

160.    Plaintiff and the other Nationwide Class Members were harmed by UBER  in the same manner because they were subject to the same course of conduct—UBER's Barrier-Free Driver Screening Scheme and violations of Section 7434.

161. Resolution of whether UBER's conduct is unlawful substantially drives this litigation centering on Plaintiff's Section 7434 claim.

162. Plaintiff's and the other Nationwide Class Members' damages are capable of measurement on a class wide basis because they are attributable to UBER's violations of Section 7434.

163. Plaintiff's and the other Nationwide Class Members' damages are calculable using simple and routine administrative and manageable processes.

Alternatively, if damages must be assessed individually, the Court may later bifurcate the case into a liability and damages phase or claims administration process.

### 2. Superiority

164. The Nationwide Class Members' interests in individually controlling the prosecution of separate actions are slight if anything because of the substantial expenditure of both resources and time involved in prosecuting a case in federal court against the $155 Billion corporate giant UBER. Ultimately, the interest of Nationwide Class Members in individually controlling the prosecution of separate actions is theoretical and not practical because the $5,000.00 in statutory damages is easily dwarfed by the cost of litigating against UBER in federal court. Pooling claims like those under Section 7434 in a class action is precisely what Rule 23 was designed to accomplish.

165. Class recovery would not be lower than individual recovery because Plaintiff and the Nationwide Class Members are entitled to the greater of $5,000 or actual damages.

166. It would be nearly impossible for all members of the Nationwide Class to individually seek redress for the wrongs at issue in this action. Even if the Nationwide Class

33

Members could afford the financial strain of individually prosecuting their clams, the judicial system could not.

167.   Paired with the threat of inconsistent or contradictory judgments and the waste of judicial resources, it is clear that class action treatment is appropriate when weighed against the alternative of individualized prosecution and adjudication.

168.   Plaintiff is aware of a putative class action in the Central District of California that was filed on October 24, 2024 asserting a Section 7434 Claim against UBER, which is subject to a pending motion to dismiss with prejudice. The named plaintiff there alleges a different theory of the case and makes different factual allegations than Plaintiff does here.

169.   Further, Plaintiff had filed a putative class action against UBER on December 5, 2022 in the United States District Court for the Southern District of Florida, Case No. 1:22-cv-23961-DPG, based on the same harms suffered by Plaintiff and caused by UBER as those alleged herein.  In that action, Plaintiff asserted claims for negligence, violations of the Fair Debt Reporting Act, 15 U.S.C.  §§ 1681, *et seq.*, and violations of the deceptive and unfair trade practices statutes applicable in each State in which Plaintiff and the Nationwide Class Members reside.  In that action, Plaintiff sought relief similar to the relief sought in the instant action, including the greater of statutory damages or actual damages suffered by Plaintiff and the Nationwide Class Members and injunctive relief enjoining UBER from engaging in the wrongful conduct that caused such damages, requiring UBER to provide Plaintiff and the Nationwide Class Members with credit monitoring, credit reporting, and credit repairs services and file with the IRS and any other tax authorities corrected tax forms.  On August 31, 2023, the Court granted UBER's motion to dismiss *without prejudice*.  Plaintiff filed this action to address the harms and the issues the Court identified in dismissing the prior action and to resolve the issues underlying his 2022 action.

170. It is desirable for both the Nationwide Class and UBER to concentrate these claims in this forum because Plaintiff's counsel is located in this district, UBER's counsel that is defending the California action is located in this district, and the courts within this district are highly experienced with large nationwide class action and multi-district litigation cases.

171. UBER's uniform willful and fraudulent conduct of filing Information Returns falsely reporting to the IRS that it made payments to Plaintiff and the other Nationwide Class Members when it did not is the same conduct giving rise to Plaintiff's Section 7434 and the other Nationwide Class Members' Section 7434 claims so litigating those claims as a class would be superior to litigating each of Plaintiff's and the other Nationwide Class Members' Section 7434 claim against UBER in individual cases.

172. There are no unusual difficulties likely to be encountered in the management of this action as a class suit that could not be managed by the Court.

173. UBER's own records should reveal the identities of the Nationwide Class Members, as will the FTC records, and information obtained from a dedicated class action website and other media publications. Current technology makes reaching absent class members an entirely manageable task.

174. The advantages of maintaining this action as a class suit far outweigh the expense and waste of judicial resources that would result from hundreds, if not thousands, of separate adjudications of these issues for each of the Nationwide Class Members.

175. Management of the Nationwide Class claims is likely to present significantly fewer difficulties than those presented by many individual claims. There is no plain, speedy, or adequate remedy other than by maintenance of this Class Action, nor is it economically feasible to pursue

remedies other than through a class action. Consequently, there would be a failure of justice but for the maintenance of the present Class Action.

176. In sum, class action treatment is proper because it will result in substantial benefits to the litigants, courts, and public by permitting the Court to address and resolve Plaintiff's and the Nationwide Class Members' claims in a single forum based upon a single presentation of proof.

177. This Class Action is the most efficient and effective means of resolving Plaintiff's and the other Nationwide Class Members' Section 7434 Claims against UBER.

**COUNT 1—WILLFUL FILING OF**
**<u>FRAUDULENT INFORMATION RETURNS</u>**
***(Violation of 26 U.S.C. § 7434)***

178. Plaintiff re-alleges and incorporates by reference paragraphs 1-177 of this Complaint as though fully set forth herein.

**A. Standing**

179. Plaintiff, on behalf of himself and the other Nationwide Class Members, sues UBER pursuant to Section 7434. *See* 26 U.S.C. § 7434.

180. Plaintiff and the other Nationwide Class Members have standing to bring this Section 7434 Claim against UBER because: (i) they have suffered actual, concrete damages in the form of money paid to professionals, loss of time from work or other business endeavors, and inconvenience; (ii) their losses are fairly traceable to UBER's conduct in willfully and fraudulently filing false Information Returns reporting UBER paid income or compensation to Plaintiff and the other Nationwide Class Members when it paid no income or compensation to them; and (iii) Plaintiff's and the other Nationwide Class Members' injuries are redressable by Section 7434 in the form of the greater of $5,000 or actual damages, plus the potential to recover attorneys' fees and costs.

**B.  Section 7434 Elements**

181.    This count sets forth a claim for damages (the greater of actual damages or the statutorily imposed minimum of $5,000.00) by Plaintiff on behalf of himself and the Nationwide Class Members for UBER's willful filing of fraudulent Information Returns in violation of Section 7434(a), which provides in pertinent part:

> **(a) In general.** If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return.

26 U.S.C. § 7434(a).

182.    Pursuant to Section 7434(f), all 1099 forms are Information Returns as the term is used in 26 U.S.C. § 7434(a). *See* 26 U.S.C. § 7434(f).

183.    UBER, as described in detail in this Complaint, has willfully filed fraudulent information returns with respect to payments purported to be made to Plaintiff and the other Nationwide Class Members when no such payments were made.

184.    The Information Returns UBER filed were fraudulent because they contained false statements of material fact in that they reported to the IRS UBER made payments of income to Plaintiff and the other Nationwide Class Members when it made no payments to them.

185.    UBER's conduct was willful because, among other things, it: (i) knowingly and willfully violated legal duties imposed by the Federal Income Reporting Laws and its own Driver Screening Policy; (ii) continues to utilize the Barrier-Free Driver Screening Scheme to rapidly increase its driver pool by employing or including in its driver pool Unscreened UBER Drivers; and (iii) possess the information necessary to avoid filing the fraudulent Information Returns but chose not to use that information in direct violation of Section 7434 and other provisions of the IRC.

186.    Pursuant to Section 7434(b), Plaintiff and the other Nationwide Class Members are entitled to recover the greater of either $5,000.00 for each false Information Return or the amount of actual damages each Nationwide Class Member sustained, as well as the costs of this action and reasonable attorneys' fees, as set forth in the statute:

> **(b) Damages** In any action brought under subsection (a), upon a finding of liability on the part of [UBER], [UBER] shall be liable to the plaintiff in an amount equal to the greater of $5,000 or the sum of—
>
> > **(1)** any actual damages sustained by the plaintiff as a proximate result of the filing of the fraudulent information return (including any costs attributable to resolving deficiencies asserted as a result of such filing),
> >
> > **(2)** the costs of the action, and
> >
> > **(3)** in the court's discretion, reasonable attorneys' fees.

26 U.S.C. § 7434(b).

187.    Plaintiff, as required by Section 7434(d), will provide a copy of this Complaint to the IRS upon filing of the Complaint with this Court. *See* 26 U.S.C. § 7434(d).

**C.  Rule 9(b)**

188.    UBER (the *who*) willfully filed the fraudulent Plaintiff 1099-NEC with the IRS pertaining to Plaintiff (the *what*) in or around January or February of 2022 relating to the calendar year 2021 (the *when*).

189.    The fraudulent Information Return that UBER filed pertaining to Plaintiff falsely reported to the IRS that Plaintiff received $1,236.50 in compensation from UBER during the 2021 calendar year, when, in fact, Plaintiff received no compensation at all from UBER during that year and has never received any compensation from UBER during any year (the *how*).

190.    UBER's willful filing of the fraudulent Plaintiff 1099-NEC pertaining to Plaintiff results from its practice of knowingly enlisting Unscreened UBER Drivers using the PII of others as drivers to feed its insatiable appetite for more and more drivers regardless of the true nature of their backgrounds (the *why*).

### D.  Fraud and Willfulness

191.    The Plaintiff 1099-NEC is fraudulent because it contains a false statement of fact, which is that UBER paid Plaintiff $1,236.50 in non-employee compensation in 2021 when UBER paid no such amounts to Plaintiff in 2021.

192.    When UBER filed the fraudulent Information Returns pertaining to Plaintiff and the other Nationwide Class Members it voluntarily and intentionally violated a legal duty imposed upon it pursuant to the Federal Income Reporting Laws.

193.    At all times material to this Complaint, UBER knew that it had a legal duty to file accurate Information Returns pertaining to Plaintiff and the other Nationwide Class Members for business payments over $600 but it voluntarily violated that legal duty when it filed the Information Returns pertaining to Plaintiff and the other Nationwide Class Members falsely reporting to the IRS payments of income or compensation to them when in fact UBER has not made the reported payments.

194.    UBER willfully made a material misrepresentation of fact on the false Information Returns filed with the IRS reporting income or compensation not paid to Plaintiff and other Nationwide Class Members because it intentionally approves Unscreened UBER Drivers as drivers on its platform to fulfill its never-ending need for new drivers—what UBER gets from its fraudulent conduct.

39

195.    UBER's motivation to reduce barriers to driver enrollment by choosing to disregard the Federal Income Reporting Laws and its own Driver Screening Policy, both of which would prevent violation of Section 7434 under the circumstances presented in this Complaint, support the finding that UBER's filing of the false Information Returns pertaining to Plaintiff and the other Nationwide Class Members were willful for purposes of Section 7434.

196.    The filing of an Information Return with the IRS reporting income or compensation that UBER pays to its drivers is solely within UBER's control as it possesses the records concerning its drivers, the income or compensation it pays its drivers, and it has a legal duty under the IRC to accurately report that information to the IRS. UBER cannot point fingers at any other actor concerning its filing of Information Returns with the IRS reporting the income or compensation it pays to its drivers. That act is solely within UBER's province.

197.    When UBER filed the fraudulent Information Returns pertaining to Plaintiff and the other Nationwide Class Members such filings were not done in error but rather as acts of intentional wrongdoing as part of UBER's Barrier-Free Driver Screening Scheme.

198.    The driver approval process is within UBER's control and UBER possesses the ability to decline a driver or accept a driver.

199.    The Plaintiff 1099-NEC is not only false as to the compensation reported but not paid, it is also incomplete because the information it provides for Plaintiff's street address is "UNKNOWN," which shows that UBER did not possess sufficient information to comply with the Federal Income Reporting Laws and complete the Information Return.

200.    UBER also chose to never obtain the background check information pertaining to Plaintiff despite having contracted with a third party to perform a background check.

201.    UBER's willful decision to disregard information shows that it knowingly violated the IRC requirements for filing accurate Information Returns and its own Driver Screening Policies, which it touts in advertising promoting passenger safety.

202.    UBER also willfully filed fraudulent Information Returns containing false information for the other Nationwide Class Members during the applicable time period under Section 7434 prior to filing this Complaint.

203.    UBER, in the fraudulent Information Returns pertaining to other Nationwide Class Members, reported to the IRS that it paid income that the Nationwide Class Members did not actually receive from UBER.

204.    The Information Returns UBER filed with the IRS for the Nationwide Class Members reported false amounts of income or compensation and are fraudulent Information Returns under Section § 7434(a).

205.    UBER knew that the Nationwide Class Members were not drivers for UBER because UBER performs thorough Driver Screening Procedures on all drivers, as set forth in this Complaint and on UBER's website.

206.    UBER represents to its customers that to ensure that it knows the identity of each driver it performs a background check and a multi-step safety screen that checks for issues including, but not limited to, driving violations, impaired driving, and violent crimes.

207.    UBER claims it then reruns annual driving and criminal history checks for each driver. UBER also claims it demands that drivers provide a photograph of themselves, which is then matched against their on-file identification to help make sure the right driver is behind the wheel.

208.    UBER should know the identity of all of its drivers if it complied with its Driver Screening Policy.

209.    But UBER does not live up to its promises to the public because internally it applies the Barrier-Free Driver Screening Scheme and knowingly and willfully accepts Unscreened UBER Drivers using the PII of individuals like Plaintiff and the other Nationwide Class Members to pass UBER's Driver Screening Policy that they otherwise could not pass if UBER chose to strictly enforce its Driver Screening Policy.

210.    Plaintiff and the Nationwide Class Members did not provide UBER with their social security numbers.

211.    Plaintiff and the Nationwide Class Members did not submit themselves to UBER's Driver Screening Procedures.

212.    When UBER filed the false Information Returns, UBER knew that the Plaintiff and the other Nationwide Class Members were not UBER drivers because they did not provide UBER with their social security numbers for purposes of the Driver Screening Policy nor did they submit themselves to UBER's Driver Screening Procedures.

213.    UBER issues electronic payments to make payments to its drivers and is aware of the identity of all of the drivers to whom it sends funds.

214.    UBER did not send driver compensation to Plaintiff or the other Nationwide Class Members.

215.    Despite knowing that the Plaintiff and the Nationwide Class Members were not UBER drivers and that UBER never sent them compensation, UBER willfully prepared and filed with the IRS fraudulent Information Returns reporting to the IRS that UBER paid income or compensation to Plaintiff and the Nationwide Class Members.

42

216.    UBER files so many fraudulent Information Returns with the IRS that it has or had a page on its website devoted to submissions of complaints about fraudulent Information Returns filed by UBER.

217.    UBER, with full knowledge that it has submitted fraudulent Information Returns to the IRS, refuses to take any remedial measures to correct its continuous practice of willfully filing false Information Returns.

218.    Because of UBER's willful and fraudulent filing of false Information Returns, Plaintiff and the other Nationwide Class Members have suffered actual damages, including without limitation the hiring of professionals to mitigate the adverse effects of the false information returns on the tax status for Plaintiff and the other Nationwide Class Members, missing work and other business endeavors, and inconvenience associated with being the victim of UBER's fraudulent tax filings.

219.    Plaintiff retained undersigned counsel to represent him and seek class certification of the Nationwide Class and the Nationwide Sub-Class to assert this Section 7434 claim on his and their behalf.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Damian R. Josefsberg, on behalf of himself and the members of the Nationwide Class, respectfully requests that the Court enter the following relief in his and the Nationwide Class's favor and against Defendant, UBER Technologies, Inc.:

A.    An order certifying the Nationwide Class and this action as a class action;

B.    An order certifying and appointing Plaintiff as representative of the Nationwide Class;

C.      An order certifying and appointing undersigned counsel to represent the Nationwide Class as Class Counsel;

D.      A final judgment awarding damages for each false Information Return that UBER filed for each of Plaintiff and the Nationwide Class Members in the amount of the greater of: (i) $5,000.00; or (ii) the amount of actual damages each Class Nationwide Member sustained as result of each false Information Return, pursuant to 26 U.S.C. §7434(b), in an amount to be determined, plus applicable interest;

E.      A final judgment correcting the amount that UBER should have reported to the IRS on the Information Returns pertaining to Plaintiff and the other Nationwide Class Members;

F.      A final judgment awarding pre-judgment and post-judgment interest;

G.      A final judgment awarding attorneys' fees and costs of suit incurred by each Class Member, as allowable by law, including, without limitation to, Section 7434(b);

H.      A final judgment providing injunctive relief to Plaintiff and the Nationwide Class Members, by enjoining UBER from (i) issuing 1099-NEC forms to, and filing Information Returns with IRS for, individuals who have not served as drivers for UBER rides, and (ii) issuing 1099-NEC forms or filing Information Returns with incomplete taxpayer PII;

I.      A final judgment providing injunctive relief to Plaintiff and the Nationwide Class Members, by requiring UBER to (i) provide to Plaintiff and all Nationwide Class Members continuous credit monitoring services, periodic credit reporting, and credit repair services, and (ii) file with the IRS and all applicable tax authorities corrected tax forms as to Plaintiff and all Nationwide Class Members.

J.      A final judgment retaining jurisdiction over this case and UBER until UBER has complied with the Court's orders and judgments; and

44

45

K.    A final judgment for such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: March 23, 2026.

Respectfully submitted,

*/s/ Kenneth Dante Murena*
Kenneth Dante Murena, Esq.
  Florida Bar No. 147486
Adriana M. Pavon, Esq
  Florida Bar No. 1025060

DAMIAN | VALORI | CULMO
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
Email: apavon@dvcattorneys.com

/s/ Ryan D. Watstein
Ryan D. Watstein
Florida Bar No. 93945

WATSTEIN TEREPKA, LLP
218 Northwest 24th Street, 3rd Floor
Miami, Florida 33127
Phone: (404) 782-0695
Email: ryan@wtlaw.com
